UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 06-CR-0249 (PJS/SRN) |
| Plaintiff, | |
| v. | ORDER |
| (1) JON HENRY SWEENEY,<br>(2) MICHELLE ANN SWEENEY,<br>(5) DANIEL JASON QUADE, and<br>(6) ABRAHAM DAVID PAQUETTE, | |
| Defendants. | |

---

Michelle E. Jones, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Charles L. Hawkins, LAW OFFICES, for defendant Jon Henry Sweeney.

John C. Brink, BRINK & GERDTS, for defendant Michelle Ann Sweeney.

Daniel B. Mohs, DANIEL MOHS & ASSOCIATES, LTD., for defendant Daniel Jason Quade.

Chad P. Nelson, CHAD P. NELSON LAW OFFICE, LLC, for defendant Abraham David Paquette.

This matter is before the Court on defendants' objections to the "infringement amounts" stated in their Presentence Investigation Reports (PSRs). The Court held an evidentiary hearing on February 11, 2009 to address these objections. At the close of the hearing, defendants Daniel Quade and Abraham Paquette withdrew their objections and agreed to accept the infringement amounts specified in their PSRs. The Court makes the following findings and rulings with respect to defendants Jon Sweeney and Michelle Sweeney.

From 1996 through 2001, the Sweeneys owned and operated Micro-Star Technology, which was engaged in the business of manufacturing descramblers. A "descrambler" is a device

(sometimes referred to as a "cable box") designed to descramble cable-television transmissions and allow the owner of the device to view premium channels and pay-per-view events, even if the owner has not paid for that programming. Micro-Star sold thousands of descramblers from 1996 to 2001. On the basis of this conduct, a jury convicted the Sweeneys of conspiracy to commit unauthorized interception of cable service, in violation of 18 U.S.C. § 371, and unauthorized interception of cable service, in violation of 47 U.S.C. § 553.[1]  Docket Nos. 245, 246.

All parties agree that U.S.S.G. § 2B5.3, "Criminal Infringement of Copyright or Trademark," is the appropriate Guideline for determining the sentencing range applicable to the Sweeneys' convictions of conspiracy and unauthorized interception of cable service. The offense level under § 2B5.3 is based on the infringement amount, which is ordinarily determined by multiplying the number of infringing items by either the retail value of the infringed item or the retail value of the infringing item. *See* U.S.S.G. § 2B5.3(b)(1) & application note 2(A) and (B). Here, it is not possible to determine the number of infringing items (in this case, the descramblers) or the number or value of the infringed items (in this case, the stolen cable transmissions). Accordingly, the Court may use any relevant information to make a reasonable estimate of the infringement amount. U.S.S.G. § 2B5.3, application note 2(E).

---

[1] The Sweeneys were also convicted of aiding and abetting currency structuring (Count Eight) and currency structuring (Count Nine (Jon Sweeney) and Count Fifteen (Michelle Sweeney)). The Court will make the necessary findings and rulings with respect to those counts at the Sweeneys' sentencing hearings, which are scheduled for later this month.

Citing Micro-Star's gross revenues of $6,435,602,[2] the Sweeneys' PSRs estimate an infringement amount of more than $2.5 million but less than $7 million, which results in an 18-point increase in their base offense levels. Even without considering the evidence presented by the government at the February 11 evidentiary hearing, the Court would find that the infringement amount must have exceeded Micro-Star's gross revenues. Micro-Star did not sell descramblers to end users; rather, it sold them to people like Quade and Paquette, who resold them to other wholesalers, to retailers, and to end users. Needless to say, the wholesalers who bought descramblers from Micro-Star marked up the price, and that price would continue to be marked up until the descramblers reached the hands of consumers. Thus, the total amount that consumers paid to "retailers" for Micro-Star descramblers would greatly exceed the total amount of Micro-Star's gross revenues.

At the same time, the total amount that consumers paid for Micro-Star descramblers would be substantially less than the amount of cable programming stolen by those consumers. No consumer would pay, say, $250 for a descrambler unless that consumer planned to steal at least $250 in programming. Indeed, given the legal risks involved, it is unlikely that a consumer would pay $250 for a descrambler unless he planned to steal a *lot* more than $250 in programming. Thus, the amount of cable programming stolen by consumers would have far exceeded the amount that consumers paid to retailers for Micro-Star descramblers, and the amount that consumers paid to retailers for Micro-Star descramblers would have far exceeded Micro-Star's gross revenues of $6,435,602. *See United States v. Gee*, 226 F.3d 885, 899-900

---

[2]The Sweeneys object to the use of Micro-Star's gross revenues to determine the infringement amount, but they do not contend that the amount is factually incorrect.

(7th Cir. 2000) (holding that district court's use of defendants' gross revenue as basis for loss was not clearly erroneous); *United States v. Poll*, No. 03-535, 2007 WL 1725491, at *1 (E.D. Cal. June 14, 2007) ("it is reasonable to believe that the infringed amount, per descrambler, was the fair market value paid to purchase a descrambler by a willing purchaser who expected to receive cable programming that would equal or exceed that retail purchase price").

At the evidentiary hearing, the government presented the testimony of three witnesses: Brian Richert, who is a director of financial planning and analysis for Comcast, a cable-services provider; Michael Muller, who specializes in products security in the cable industry; and Special Agent Dean Chappell, who examined documents and financial records seized from Micro-Star. The testimony of these witnesses confirms that the infringement amount exceeds the amount of Micro-Star's gross revenues.

Richert has substantial experience in creating and reviewing budgets, financial statements, and revenue projections for Comcast, and he is also responsible for conducting a yearly pricing analysis. Based on his experience and his review of historical data for the cable industry in the Twin Cities region, Richert calculated a "weighted average" of lost revenue per subscriber for each of the years 1996 through 2001. In other words, Richert calculated how much revenue a cable provider would have lost on a basic subscriber who used a descrambler to steal premium programming. Richert calculated the following weighted averages: $379.25 for 1996; $357.53 for 1997; $283.92 for 1998; $321.72 for 1999; $366.87 for 2000; and $366.99 for 2001. *See* Gov't Exs. 61-66.

Using records seized from Micro-Star, Chappell determined that Micro-Star sold 63,700 descramblers in 1999, 35,976 descramblers in 2000, and 78,584 descramblers in 2001. (Sales for

1996, 1997, and 1998 could not be determined.) Based on these sales figures and Richert's figures, Chappell calculated that the sale of Micro-Star descramblers deprived cable companies of revenue in the amount of $20,493,564 in 1999, $13,198,515 in 2000, and $28,839,542 in 2001. Adding these figures together yields a loss amount for 1999-2001 of $62,531,621 — an amount that is nearly *ten times* the amount of Micro-Star's gross revenue and approximately *twenty-five times* the amount necessary to trigger an 18-point increase in the Sweeneys' base offense level.

The Sweeneys question the relevance and reliability of these figures, arguing that they are unreasonable because, for example, they are based on the assumption that all purchasers used the descramblers illegally. But as the Court explained at the hearing, the Court finds, based on the evidence presented at trial, that it is likely that the vast majority of the descramblers were used unlawfully, particularly in light of the fact that customers paid an inflated price for them. A customer who intended to pay for premium services could rent a cable box from his provider for a nominal fee — and have the peace of mind of knowing that, if the box malfunctioned, the provider would have to repair or replace it. A customer could also buy a cable box from his provider for less than he would pay for a cable box manufactured by Micro-Star. It would be irrational for consumers who did *not* intend to steal programming to spend extra money to buy a Micro-Star descrambler from someone like Quade or Paquette.

Other objections made by the Sweeneys — such as the complaint that Richert's numbers reflect cable rates in the Twin Cities, where few Micro-Star customers were located — miss the point. The government relies primarily on the reasoning described above — that is, on the argument that the amount of cable programming stolen by consumers would have far exceeded

the amount that consumers paid for Micro-Star descramblers, and the amount that consumers paid for Micro-Star descramblers would have far exceeded Micro-Star's gross revenues of $6,435,602.  The government presented testimony merely to provide some confirmation of the soundness of this reasoning.  The government readily admitted that there were many reasons why the Richert and Chappell numbers differed from the actual infringement amount.  But that testimony nevertheless succeeded in providing a rough "ballpark" estimate of the infringement amount — and confirmed that the infringement amount surely exceeds Micro-Star's gross revenues.

Indeed, there is reason to believe that Chappell's estimate of $62,531,621 in losses grossly underestimates the infringement amount.  First, as noted, Chappell's estimate encompasses sales for only three of the six years that Micro-Star was in business.  Sales for 1996, 1997, and 1998 could not be determined.  Without question, though, Micro-Star sold thousands of descramblers during those three years, and the losses caused by those sales are not reflected in Chappell's estimate.  Second, Chappell's calculations assume that the descramblers would be used for only one year, but Muller (the cable-security expert) testified that the average useful life of a descrambler is seven years.  For these reasons, Chappell's estimate is extremely conservative.

Under U.S.S.G. § 2B5.3, an 18-point increase applies to the Sweeneys' base offense levels as long as the infringement loss exceeded $2.5 million.  That figure is about four percent of Chappell's estimate.  Even if the Court is incorrect in concluding that Chappell drastically underestimated the loss — that is, even if Chappell somehow overestimated the loss — the Court is certain that Chappell did not overestimate the loss by a factor of twenty-five.

For all of these reasons, the Court finds, by a preponderance of the evidence, that the infringement amount exceeds $2.5 million.  The Court will therefore apply an 18-point increase to the Sweeneys' base offense levels.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that the objections of Jon Sweeney and Michelle Sweeney to the infringement amount stated in their Presentence Investigation Reports are OVERRULED.

Dated: March 4, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge